Good morning, Your Honors, and may it please the Court, Alfredo Jarin on behalf of Appellant Milton Lee Vandevort. I'd like to reserve five minutes for rebuttal. Mr. Vandevort has now been in prison, it's now almost three years, based on an extraordinarily vague and strained theory that the government had that he must have somehow owned a benefit, a beneficial interest in his wife's home, in a business that his wife alone started, that his wife alone owned. Why? Because he simply had the benefits of being married to someone who happened to have a nice business and a comfortable home. And when he filed for a personal bankruptcy, he didn't list those assets because he did not and didn't think he owned any such beneficial interest in them. The jury instruction, though, didn't use the term beneficial interest. The jury instruction just tracked the language of 152 and then the language of 541. Exactly. So although the government argued beneficial interest, the district court didn't give that instruction and clarified,  So why was it wrong to just instruct the juries on what was clearly the law? Because throughout the indictment and throughout trial, the term beneficial interest was used. And it was used confusingly and interchangeably with a term that is used in the statute, equitable interest. But why wasn't that eliminated as a problem by the jury instructions which gave the correct law? Because it did not – actually, the jury instruction was premised on a faulty statute which doesn't put persons like Mr. Vandervoort on notice as to what constitutes an equitable interest. What it is, they're supposed to know that they're supposed to disclose on a bankruptcy schedule. Did you ask for a specific instruction saying that an equitable interest can't be a beneficial interest and a beneficial interest is X, Y, and Z? Trial counsel requested a specific instruction clarifying what the government needed to prove. What was the substance of that instruction? The substance of that instruction was that in order to prove that he had this beneficial interest, that he had to show that at one time he owned property and he concealed it and he retained a secret ownership interest in that property. And did he use that – was that instruction proposed as a definition of what an equitable interest is? Not precisely. It was proposed as a follow-on to that instruction because the government had added the term beneficial interest to the model instruction. And then there were three options that the court considered. Okay, you either excise that last sentence or we keep it in and you argue and I'll let you argue beneficial interest because that's what the government wanted to do. They just wanted to argue to the jury, I need to be able to argue benefits and control. Use benefits and control. Well, that's not – I mean, the Supreme Court, I think, starting with Butner and certainly the Ninth Circuit, has made clear that the property interests in bankruptcy are the ones as defined by state law. So I think that's just black letter law for bankruptcy. So that makes me question why your client wasn't on notice. But the trial counsel didn't ask for that instruction, that property interests are controlled by the law of the state. So why wasn't just tracking the law in the absence of any request for a state definition of equitable interest? Why was that misleading or why was that wrong? That's what puzzles me. Well, both on its face and certainly as applied to Mr. Vandervoort, under the facts of this case where this was a zero-asset bankruptcy. Mr. Vandervoort didn't own anything. His wife owned and ran the business and owned the home. He lived there and he helped out. That was the use, benefit, and control that he had here. And that's why under these facts, the statute, this brings us back to why the statute itself is inadequate because it does not define equitable interest and certainly not equitable or beneficial interest such that someone can be incarcerated. Beneficial interest is not in the statute. And the case law, I think, starting with Butner, so quite old case law makes clear that those interests are defined by state law. So I have trouble with your argument that there was something vague or mysterious about the statute. I think reading the statute with long-established black-letter law, we know that the property interest is whatever you could go into a state court to enforce, whether it's equitable or legal or whatever. But when I look at the language from Stooley, I guess, v. Hyatt, which is the secret interest case, retention of a secret interest, wasn't there ample evidence that the jury could rely on that Mr. Vandervoort did retain a secret interest in the property? There was evidence of interest through these pass-through AT&C entities and the like and the taking money out of the property and putting it into the escrow account, which was then used to buy property in the name of an entity in which he had an ownership interest. So there certainly was a lot of evidence presented by the government that there was some sort of secret interest. All these entities were formed, always-there nursing care entities were all formed and controlled by Ms. Hanlon. But he had an interest in some of them, correct? He was a partner. He was a partner in one of them. AT&C partners. He was a beneficiary in the Ojai Trust or whatever. AT&C partners was merely set up at Melissa Hanlon's accountant's suggestion for tax and tax planning purposes. None of that meant that Mr. Vandervoort ever had an ownership, secret or otherwise, in his wife's business. He helped out and she paid him a salary from time to time. If you have a partnership interest in an entity that owns the residence, then you at least indirectly on paper would have an ownership interest, an indirect ownership interest in the property, wouldn't you? The residence is owned by Ms. Hanlon. Now. But for some period it had been transferred, right? Yes, but Mr. Certainly Mr. Vandervoort had been off title since 1999, some six years before he ever filed for bankruptcy and at a time when he didn't have any creditors. But doesn't he use the funds from the refinance of this Bel Air home for purposes of purchasing this Wyoming property? Doesn't he actually take money out of the escrowed refinance funds that flow from the home and buy this? Ms. Hanlon does. Ms. Hanlon alone refinanced that home. And yes, she was helping to purchase a property in Wyoming. Which he lives in, right? Which he lived in, not Ms. Hanlon. That was the plan that he was going to. But the whole family was going to eventually move to Wyoming. But yeah, he was living up there. He was renting a property up there in Wyoming. And then he had purchased, they were going to purchase a tract of land, but he wasn't going to own it. But didn't that go to the Ojai Trust where he and his mother were beneficiaries of that? Ms. Hanlon's mother, Harriet Rosenberg. And he was a beneficiary as well? I thought that's what the record showed. The Ojai Trust was established for the purpose of buying these properties in Wyoming. Was he a beneficiary? It ended up not happening. But was he a beneficiary of that? So it was... I do not believe that Mr. Vandervoort was a beneficiary of that trust. It says. Okay, I'll check my notes or otherwise, but I may be wrong. Can I direct you back to the instruction issue for a moment? I'm still not clear on what you think, taking the instructions as a whole, what was not communicated in the instructions that you think should have been communicated. And I know the discussion of beneficial interest and the fact there wasn't an instruction that defined that term. But as I also understand it, you did get instructions with respect to have to show, prove bad faith beyond a reasonable doubt and other instructions that you asked for. What is it that the jury did not learn from the instructions that you think the jury should have learned? The jury did not learn what a beneficial interest is. The crux of a government's entire case, the entire conviction turned. Let me stop you on that. And what is it that you think they should have known about the meaning of a beneficial interest that they were not advised of? What is it that you think they should have heard about what a beneficial interest is? Well, much as trial counsel had requested, a definition that included something more concrete than this loose ad hoc definition that, oh, he lived in the house. He had the benefits of living in a house, so he must have owned it. Did you propose an instruction that said beneficial interest or whatever interest the jury is supposed to consider does not include simply living in the house? I mean, what I'm trying to get at is I don't know what you asked the trial judge to do. The trial counsel did ask the court to ask that the jury be instructed that the residence was, in order to prove a beneficial interest or prove beyond a reasonable doubt that he had concealed property, that one, they would have had to show that the property belonged to Mr. Vandervoort, that he transferred it with the intention of concealing it from his creditors. And again, in this case, he had no creditors, and the government never alleged that this was a fraudulent transfer case, and that he retained a secret interest in the property within a year of his petition. And the district court even agreed with that formulation, and therefore gave the government the option of excising the last sentence that it added to the model instruction, and then the government would be precluded from arguing beneficial interest, or second, allow the government to argue beneficial interest, but require a jury instruction defining the three elements of a fraudulent transfer, or excise the last sentence but provide a separate instruction defining beneficial interest. The court, we have a district court, two assistant U.S. attorneys, and two experienced defense counsel at trial who are engaging in this lengthy colloquy to say, how are we supposed to instruct the jury on this? And even the assistant U.S. attorney says there has to be an instruction on beneficial interest. It's used throughout the indictment. We used it throughout the trial. And I need to be able to argue use and control that that is what makes a beneficial interest. Because that's what they convicted him of. But that was wrong, right? I mean, that was wrong, and the district court didn't give that instruction. I mean, it said that in the indictment, but the evidence at trial and the instructions were arguing just the 152. This particular jury instruction is going to Section 152.1, correct? Correct. Am I right? And that has to do with concealing. It's nothing about transferring. Knowing and fraudulently conceals any property belonging to the estate of the debtor. And that's exactly what the district court instructed the jury. It didn't instruct the jury. It rejected the beneficial interest. But what was concealed, what was allegedly concealed, was some vague beneficial interest that Mr. Vandervoort is somehow was accused and incarcerated for knowing that he should, that on a beneficial interest theory that was never explained to the jury, even though everybody in the courtroom while discussing the jury instructions is agreeing that, yeah, they need to be instructed on this, they need to be instructed on this. And the next morning, the government decides, well, we're going to excise that last sentence, but, about beneficial interest, but I'm still going to be able to argue use and benefit use and control. And that was never an option. It's a jury question, though, at that point. The jury decides whether or not that's sufficient to satisfy the elements of the charge. But there is no case on, as a matter of law, it is not the truth that simply having the use and the benefits of living in a home indistinguishable from any other house guest or drawing a salary from a business where you may be an employee or even an officer of doesn't mean that you own that business. But isn't that, I mean, it was just argument by the government. Isn't it trial counsel's job to argue that use and control does not, of property, does not make it property belonging to the estate of the debtor? Yes, and I believe that there was an attempt to argue that. But in the absence of a jury instruction that goes to an element of the offense for which Mr. Vandervoort was convicted and incarcerated, I believe that that is a reversible error. Did we have the case of Weinstein that says, well, anyone can understand what this means, property of the estate of the, property belonging to the estate of a debtor. This is easily, readily comprehensible or whatever we said. In United States v. Weinstein, it wasn't. United States v. Weinstein is readily distinguishable and in ways that support appellant's position in this case. In Weinstein, the court said he was clearly in charge and treated that travel agency as his own and he treated it as his own to the exclusion of all others. He wasn't like a mere, like any other extended house guest or an employee. He was treating this company as his own. Mr. Vandervoort never had so much a signature authority. But that's just evidence, right? The question is, is there a problem with the instruction? And we said in Weinstein, no, there wasn't any. In Weinstein, there was no request of any kind for a jury instruction. There was a completely different theory on appeal than what had been followed at trial. Whereas here, Mr. Vandervoort has consistently asserted what is the truth, is that he, pursuant to a prenuptial agreement, which no one has ever seriously contested, he owned nothing of what his wife earned, what his wife purchased. This is precisely what the jury had to decide, whether or not they believed that or not. Isn't that the essence of the battle, where you're saying he's nothing but a house guest? Well, the government's saying this is all a sham, that he's a lot more than a house guest. And the jury gets the instruction on the elements of 152, and they make a determination on whether or not he really did have some interest in this property or not. But whether that interest, his ability to live in a house and be an employee of his wife's company, is sufficient to constitute a beneficial interest, that he was somehow supposed to know that he was supposed to disclose on a bankruptcy schedule, is something the jury was not instructed on. What is sufficient interest? Yes, of course he's living there. That is obvious. That's easy to see. Does that make you the owner of a property, just by virtue of living there? It's indistinguishable from any other guest or tenant. And that's what the jury was not instructed on. And just turning back to the Weinstein case, there, the manner of dealing with the assets showed that they were owed by the company. It's the government here that has changed its strategy on appeal, scarcely mentioning the word beneficial interest in Apelli's brief, whereas it was the crux of the government's argument in order to convict Mr. Vandervoort. And it was a very loose, ad hoc definition used interchangeably. Beneficial interest, which is not used in section, and equitable interest. And that's why there needed to be a jury instruction on that, rather than suffering a criminal conviction on such a loose, amorphous, and moving standard governed only by the government's argument. Well, I mean, even if, you know, even if the district court should have, and I don't know that, I haven't yet resolved my own mind, whether the district court was required to give an instruction on the definition of what, that an equitable interest included a beneficial interest, and the beneficial interest under California law meant X, Y, and Z. But in any event, even if the court was required to do that, we still review for harmless error. And as Judge Okuda elaborated or pointed out, there's evidence here that, you know, things were just kind of flowing, and he wasn't really being forthright in disposing all his involvement. His involvement involved, he helped take care of the house, and he helped in the business for which he was paid. That was the extent of his involvement. But that use and benefit and supposed control is, went to an element of the offense for which he was convicted, and there was no argument on it. There's a lot more evidence than just that. Maybe I used the wrong word, but Judge Okuda pointed out there was other evidence here that suggested that he had a greater hand in how this money was spent, and the property, his control over the property and whatnot. I mean, I don't. So even if you're, in other words, even if that court had given the instruction. I would suggest that had there been truly evidence of that type of control, whereby the government could have actually established an equitable interest or some other sort of ownership interest, they would not have had to rely and desperately rely on arguing use and benefit in this loose manner. Had the evidence shown anything other than the fact that it was simply as stated. Mr. Vandervoort was supported by his wife. He worked for her, and obviously they lived together, and as a result of that perhaps unusual marital arrangement, the government was able to concoct a theory under which they're saying, no, of course, the husband must really be running the show here, and that really was not the case. I would like to reserve some time. I'll give you one minute for rebuttal. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. AUSA, P.O. Camp for the Ministry. There have been a lot of questions about the facts of this case, so perhaps I should start out by. As you do that, what was the theory of your case? Make sure you tie it to the statute. Yes, Your Honor. The theory of the case was that the residence in Bel Air and the AT&T, the nurse registry business, were properties of Mr. Vandervoort, simple and straight. He didn't have a direct ownership interest. I guess at various times he had indirect ownership interest perhaps, but he didn't have a direct ownership interest, correct, at the time of the bankruptcy? At different times, his ownership was different. I believe at least before year 2000, his interest was direct ownership. There is a fictitious business statement he filed in 2003, which states that he was doing business as AT&T starting 1997. If I may, that is GER 127 to 130. And starting 2000, we see tax returns by Mr. Vandervoort and his wife, Mrs. Hanlon, jointly filed, and AT&T partners income statement. The joint statements goes from 2000 to 2005, and the partnership statement goes from 2000 to 2004. These tax returns show that Mr. Vandervoort and Mrs. Hanlon owned numerous businesses, including the nurse registry business 50-50. So this is from the period from 2000? 2000 to 2005 is the joint tax returns. 2000 to 2004 are AT&T partners. And he's a partner in that? So AT&T owned the property, the residence, and he's a partner in that? Yes, Your Honor. AT&T is the owner of the business. If I could just switch over to the residence a little bit, if that would be helpful. What happens with the residence is this. In 1993, the title to the residence is placed in both Mr. Hanlon's and Mr. Vandervoort's name. And for the next six years, the title remains. And then for a period of one year, it gets transferred to Mrs. Hanlon's name. And after that one year, the title is placed into AT&C, Inc., the corporation. And the title remains in the corporation's name until shortly before the filing of bankruptcy. Now, what's important here is that AT&C, Inc. is owned by AT&C partners, which are owned 50-50 by Mr. Vandervoort and Mrs. Hanlon. So when we do the calculation, for approximately 11 years before the filing of bankruptcy petition, about 9 to 10 years, Mr. Vandervoort is either on the title himself or owns the title to the real property through his ownership of AT&C partners and AT&C, Inc. Now, the 93-99 period, isn't the defense position that that was a mistake of some kind and then it gets rectified with a quit claim back to Mrs. Hanlon? Yes, Your Honor. Now, that's a really interesting statement that Mr. Vandervoort makes, that he was put on the title in 1993 by a mistake. That's just patently false statement. Now, what mistake can they be, could have been? He was placed on the title because he was a co-borrower on the loan. There was no dispute that he was a co-borrower and he, from the bank's perspective, was the owner. And that's why his name was placed on the title. There was no mistake. Was there an explanation at trial? Was there any evidence that explained the position that it was an alleged mistake? Yes. No, not really. What Mrs. Hanlon testified was, I was a woman and the bank people told me that the financing would go easier if I had my husband on the loan. That was the explanation. But obviously, that's not a mistake. Both Mr. Vandervoort and Mrs. Hanlon knowingly entered into a loan agreement whereby he was going to be on the title. So when Mr. Vandervoort said that was a mistake, I think that's a mischaracterization of what had happened. So we know from their sworn tax returns that their practice was to own assets 50-50. We are not simply just talking about one business here. If you look at their tax returns, they speak to three other businesses. So we're talking about AT&T Partners, ECI, Spill It, and Esho. All 50-50 throughout the time that the government was able to obtain tax returns. Not to mention the fact that Mr. Vandervoort is filing fictitious statements, business name statements indicating that he was doing business as AT&T. Now, that's prior to filing the bankruptcy petition. When did he actually file the bankruptcy petition? I believe early January 2005 in Wyoming. It was filed in Wyoming and then it was transferred back to L.A. And I believe the significance of the filing in Wyoming is that Wyoming is a non-community property state. I think Mr. Vandervoort wanted to use that to create sort of a legal fiction. The whole point is he was going to say, look, everything belongs to my wife. And he was going to get the discharge of the debts in the bankruptcy in Wyoming and then says, you can't get to my wife's property because it's all separate property. That didn't ultimately work because the bankruptcy matter was transferred back to L.A. Just to go back to Fats a little bit more, what did happen after the bankruptcy petition was filed? Did anything really change? No. Let me just point out to what happened with the money that was coming from the nurse registry business. He files the petition indicating that he was getting a salary from ECI in the amount of $2,500 January of 2005. Now, ECI is basically his piggy bank. The money from the nurse registry gets deposited into AT&C and then AT&C transfers money to ECI and Mr. Vandervoort uses money out of ECI account for his personal expenses. The government's excerpts, the last three exhibits has a financial analysis of how he was using the money in the ECI. It's basically his credit cards and cash withdrawals. Now, in January of 2005, he says he's getting $2,500. A month? A month, that month. But let's look at the facts. December of 2004 and November of 2004, so basically two months before filing a bankruptcy, ECI receives from the nurse registry business $6,000, that's November, and $13,000, that's December. So immediately before he files bankruptcy, he's getting $6,000 and $13,000. So is this supposed to raise the inference that he has an ownership interest or did you have direct evidence that he had an ownership interest? The direct evidence were his tax returns and also his statements, direct statements to a banker in Wyoming. As court may recall, he had to obtain financing to purchase a piece of lot in Wyoming. And he was talking to a banker named Mr. Wright. And to Mr. Wright, he says, I and my wife own the nurse registry business and we operate it together. And that's a direct piece of evidence post-bankruptcy. So let's turn now to the way in which the case was tried and the jury instructions and the arguments that were given where there was a great deal of concern about the term beneficial interest. Given what you just went over with us right now, why was it significant to your argument before the jury that what he really had was a beneficial interest? You have to describe the facts to the jury and you have to use words. After describing these facts, you want to summarize it for them. And you have to use the right words. So what right words could we have used? So we used, he used it, he controlled it, he benefited from it. Those are the descriptions that relate to ownership. But is, I mean, you can own property and not use it necessarily. I mean, ownership and use, use could raise an inference that you own it, but they're distinct issues. And here the question was whether he owned the property or not. Is there anything in California law, I assume that was the law that was applicable, that would say beneficial interest, which seems more like a bankruptcy-type term, that beneficial interest you could go into court and enforce an ownership interest in that property? I mean, I can see like with an easement maybe. I mean, what were you thinking of with beneficial interest? That just doesn't seem to be an ownership-type interest necessarily. Court is correct, Your Honor. But what happened during the entire process was that the government realized we just have so much evidence, overwhelming evidence. And trying to define equitable interest, we ultimately determined it was not necessary. And therefore, what we tried to do was explain what sort of things the jury could look to, to figure out that Mr. Vandiver owned both the residence and the business. So that's why we started trying to use the words use and control and he benefited from. So why would it have been improper to provide that kind of instruction to the jury? We believe that it was not necessary. And we believe that trying to provide an instruction, we were going to get into an unnecessary dispute with the defense. You may recall when the government first proposed its definition or description of what equitable interest would be, the defense immediately started injecting what we thought were completely irrelevant issue. On page 28 of the appellant's brief is their proposed instruction. And look, the third element of their proposed instruction is he retained a secret interest in the property within a year of his petition. That sentence struck us immediately as completely unnecessary and is going to ultimately confuse the jury. Number one, within one year, that part of the proposed instruction comes from the fraudulent transfer statute. But we didn't have the fraudulent transfer statute. Not only that, their instruction had to do with the secret trust, meaning they're throwing into the case not just the one, completely irrelevant one-year limitation period, but also this brand-new concept of a secret trust. Isn't that just taken out of Stooley v. Hyatt? Isn't that the language we used there? I don't recall it. Retention of a secret interest by the bankrupt. The property must, in effect, be held in trust for the bankrupt. That's defining 152, what the ownership interest is. I believe the court is correct. I do not recall the case specifically. But our view was you don't need to talk about secret trust in order to get to equitable interest or ownership. What's an equitable, what equitable interest in California could you go into court and say the title's in my wife's name, but I actually am entitled to 50% of it? I mean, what sort of interest would you have that you could enforce in state court? I mean, wouldn't it always be a trust or a constructive trust of some sort? I mean, if I said I'm using the property and my wife says, my husband says, well, it's my separate property and I let her stay there, does that mean I can enforce an ownership interest in that property in California? Your Honor, I would love to stand here and answer that question for you. But I feel that my understanding of California law is inadequate. But what I could tell you is whatever the California law may be, I don't believe there is any definition of equitable interest or enforceable write-ups that does not fit our case. And I think that really is the crux of this case. Nobody could defend, certainly didn't try, and we tried, at least in the beginning, that would come up with a definition of equitable interest that would satisfy everybody's curiosity or questions. I mean, in every case that we're dealing with words, you're going to have some gray areas. And we may not be to our lawyerly standard, have a definition that's just foolproof. Do you have a case that says use and control alone is enough to create an equitable interest as a matter of law? We have cited Lawson, Kauffman, and Oliver. Well, some of those cases were fraudulent, because they answered 727 cases. Yes, Your Honor. So they didn't establish, they weren't looking at the same language as property of the estate. They were not looking for the specifically same language. But I think all those cases found that the defendant had, defendants in those cases had interest, equitable interest in the assets in question. If you look at those cases, none of them gives you what equitable interest is. They don't say, hey, this is the definition of equitable interest. And there's no California case law that you can look to one case or you can look to several cases and say this is how California defines equitable interest? I was not able to find such a case law. Incidents of inequitable interest? I don't believe I did the specific search relating to California law. But I have done thorough search relating to the federal cases. And I did reach out to my colleagues over at Civil Society who do bankruptcy cases, and I was not able to get from them any case defining what equitable interest is. But if I may take the Court's attention back to Weinstein case and the case we cited in our brief Cardell case, I believe both cases stand for the proposition that you don't need to define what equitable interest is because we understand what the statute is saying. Now, I would... Well, the question we may understand, but does a reasonable jury understand? I think the Court has said that the terms of the 152 are readily comprehended. The property. We all know what property is, especially in a case like this. When somebody declares to the world under penalty of perjury that I own this asset, and all of a sudden the old asset is going to somebody else's name or some other entity, and he still uses it like his. In 2005, ECI got more money than it did before. So in January 2005, he says he's getting only $2,500. March of 2005, he gets $16,000. April of 2005, he gets another $16,000. This is after the bankruptcy. It's two, three months after filing a bankruptcy. And not to mention the fact that he says he owns the property, he owns the business. He says it after the bankruptcy. Again, referring back to his statement to the banker. And it seems like all you had to do was stand up in front of the jury and argue that he just had a direct ownership interest, no matter whatever. I wish. Even though there was no document, there's no contract, there's no written, there's no documentary evidence, his own statements demonstrate that he had an interest in the ECI and ultimately the property. I wish I had spoken with Your Honor before we tried the case. We were just being lawyers. We had to have everything defined to an extent. So one thing that bothered me a little bit here was, you know, when the judge was trying to figure out whether to give an instruction or not on all of this, and the government said, well, it's a legal issue. We can still argue this legal issue as to what beneficial interest is. Remember that exchange? Yes, Your Honor. I always assumed that it was the court's responsibility to instruct the jury on the law. I think ultimately it is the court's, but I believe as the litigants we do have the burden and the responsibility of providing the court with the right case law and right understanding of law.  Ultimately, what we wanted to avoid was sort of falling into what we thought were the defense's unnecessary injection of needless issues. Because once this jury instruction became an issue, the defense was insistent that equitable interest cannot be defined by benefit and use. No, you can't do that. Simply that's not right. Did they offer any law on that point? No. So there was no law on either side? Well, Weinstein and Cardell. You didn't bring that to the district court judge's attention. We did not. We did not. But at that point, we were citing Lawson and Kaufman and Oliver. Now, granted those cases are not cases relating to whether or not a jury instruction on equitable interest is necessary, but nevertheless those cases indicate what you look for to determine whether or not there's an equitable interest. Your formulation, benefit and use, how could that not get you in the difficult circumstance of the houseguest analogy? I mean, couldn't you get convicted under your formulation, the argument you made, as to what constitutes beneficial interest? Couldn't a houseguest get convicted under that definitional argument you made? If that was the only thing we said, look, if this person had the use, if this person had control, I think the court is right. There's the danger that a mere tenant might have a problem. But I don't believe that's what we'd argued, and certainly that's not what happened in terms of the evidence we had presented to the jury. The evidence, I believe, is just overwhelming. And court recognized that. The court used the word avalanche of evidence. If I may finish. I'll let you go over your time because I had questions and my colleagues had questions. But you need to wrap it up because you're now four and a half minutes beyond your time. And I'll give you. Yes, Your Honor. To make your last point. The last point, I believe, perhaps what I should do is talk about the calculation of the laws. The case that's directly applicable on that issue is the Bussell case, the Ninth Circuit case. In that case, court basically says, look, you can't just categorically base the intended loss amount on the amount of the concealed asset. You need to look to the economic reality of the case in order to get to the intent of the individual. Here, the facts of Bussell and our case are, I believe, in all functional aspects, identical. Very extremely complicated transactions and extremely complicated fraudulent transfer. We'll take a look at Bussell. I can assure you. And in light of that case, I believe the court was correct in finding that the defendant intended to inflict the harm in the amount of the debts he listed. Okay. Thank you, counsel. Roboto, you're going to have a minute or whatever time you have left. What was it? He's over. He's over.  He's got a minute. Thank you, Your Honor. Just addressing a couple of points brought up by Mr. Kim. ECI was an account. That's where when he got a salary from Always There Nursing Care, whatever his wife chose to give him, that's where it went. But all these other entities, these nefarious entities, Asher and Spillett, none of these companies ever did anything. None of these were any operating companies that generated any kind of money whatsoever. The only money generated in the Vanderbilt Hanlon family was the money that Ms. Hanlon was able to make through her contents and connections in her company. And, however, they chose to file jointly for tax returns or other purposes, and there was testimony from the accountant that that doesn't change. How you treat something for filing purposes does not necessarily mean whether you have changed title or vest title in anyone. The government also relies on statements to a banker in Wyoming. He's talking to somebody who's trying to buy property. Everything Mr. Vanderbilt said was consistent with how just a spouse would talk about, yeah, we have this or we have that. Just the fact that he's talking big while he's up in Wyoming to a banker doesn't transform the nature or ownership of the property. Using it doesn't do that. Any more than my borrowing somebody's car and telling everybody that it's mine, and if I have to file for bankruptcy, I now have to somehow disclose a beneficial interest in that car. That's clearly not the case. Last point. They were unable, the government was unable to say why, if they had an avalanche of interest, why they couldn't just charge him with having a legal interest here. And that's because they didn't, despite all this manufactured evidence of points that make Mr. Vanderbilt look bad. The fact of the matter is he never had an interest, beneficial, equitable, or otherwise, let alone whether the fact that the jury wasn't instructed on that. And even if there was an avalanche of interest, that didn't relieve the obligation to instruct the court, to instruct the jury as to each element of the offense. Thank you, counsel. We appreciate your arguments. Thank you, Your Honor.
judges: Seeborg, Paez, Ikuta